MARY BELLE ROBERTS, The (SPEYER v.). See Case No. 13,240.

## Case No. 9,201.

### The MARY C.

[1 Hask. 474.] [1]

District Court, D. Maine. Jan., 1873.

PLEADING IN ADMIRALTY — AMENDMENT TO ANSWER—COLLISION—BAFFLING WIND—RIGHT OF WAY—ITEMS OF DAMAGE.

1. An answer cannot be amended after the cause has been heard, so as to contradict a material admission in it.

2. A vessel on the starboard tack, nearly close-hauled with the wind one or two points free and baffling, need not give way to a vessel on the port tack close-hauled, when the vessels are crossing.

3. A vessel having the right of way must keep a proper lookout and use proper seamanship to avoid collision.

4. Freight money lost by the master of a sinking vessel when hurrying from the wreck and sails used for covering the deck-load are proper items of damage in cases of collision.

A cause of collision heard on libel in rem, claim, answer and proofs.

Nathan Webb, for libellant.

Almon A. Strout, for claimants.

FOX, District Judge. This collision took place between the Schrs. Sarah Buck of Belfast and Mary C. of St. Johns, about fifteen minutes after twelve in the morning of Dec. 12, 1872, and about seven miles southwesterly from Monhegan, and resulted in the total loss of the Sarah Buck, she having sunk. The night was very clear, with a whole-sail breeze. The Sarah Buck was on her port tack, without cargo, and on her return to Belfast from Salem. The Mary C. left Seal Harbor, near White Head in Penobscot Bay, about 8 p. m. Dec. 11, in the prosecution of her voyage from Rockport, N. B. to New Haven with a cargo of grindstones. She was on her starboard tack. Each of the vessels laid within about six points of the wind. The libel avers that at the time of the collision, the Sarah Buck was close-hauled, and the Mary C. free. These allegations are denied in the answer; but it does admit that the Sarah Buck was sailing on a course "about northeast," and avers that the wind was then north-northwest; this would be within six points of northeast, and I therefore consider it as established from the claimant's answer, that the Sarah Buck was close-hauled as is set forth in the libel.

Cook, master and part owner of the Mary C. alleges in his answer, which is subscribed and sworn to by him, that when he left Seal Harbor, "the wind was baffling from northwest to north-northwest;" after the case had been fully heard and the arguments closed, a motion was made by his proctor for leave to amend this averment in the answer by changing northwest to northwest by west. The amendment was not allowed;

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

and on further reflection, I am satisfied that the ruling was correct. The cause had been fully heard and argued to the. court, with this admission in the answer as to the course of the wind; it was a deliberate, sworn statement by the master, of the fact as he understood it to have been when called upon to respond to the charges against him in the libel, and it is not the practice of any court, at such a stage of the cause, to permit a material amendment which will destroy the effect of an admission of so much importance, relative to a matter which had been a principal subject of controversy before the court for more than ten days. The amendment, if allowed, would at once produce a conflict with the testimony of the master given by him upon the stand, as he had stated, that the wind was northwest when he left Seal Harbor, baffling a half point each way; and the only advantage to be derived from the amendment would be, that the statement in the answer would then more fully agree with the testimony of some of the witnesses produced by the claimant, by whom the wind was represented to have been still more westerly than is asserted by the master, either in his answer or testimony, and which the court is not convinced is in accordance with the truth.

The libel alleges that the wind at the time of collision was north, and that the Sarah Buck was on a course of northeast by east, and her master reiterates this statement when examined as a witness. Her crew, all of whom assert that they were on deck at the time, testify that their course was northeast by east, one half east, as this vessel did not sail nearer than within six points of the wind; it is manifest that these statements of the master and his crew are not correct, as with the wind north, a course of northeast by east would be within five points, which this vessel could not accomplish. There is therefore, to say the least of it, a mistake on their part in relation to the wind, or the course they were sailing, and perhaps they are incorrect in both particulars.

The crew of the Sarah Buck represent that the Mary C. when first discovered was one and one half to two points on their lee bow; the libel states her as being one and one half points, about half a mile distant; the answer on the contrary represents that when the Sarah Buck was first seen from the Mary C., she was on her lee bow. The claimant has produced in court a diagram in explanation of the position of the two vessels when first seen and as they came in collision; and he has stated it was substantially correct as laid down in this diagram; the Sarah Buck is clearly to the windward of the Mary C. and it fully corroborates the allegations on this point in the libel.

Upon one other matter there is a very severe conflict; every man on board the Sarah Buck swears that her regulation lights were in place and burning brightly, and that after the collision, one was taken down, was then burning and was extinguished by the master and brought on board the Mary C. The crew of the Mary C. all testify that they saw no lights on the Sarah Buck, that their attention was called by Capt. Cook to the absence of her lights, and upon this, they are said to be corroborated by the testimony of the master and mate of the Favorite of Cornwallis, who testify that at the time of the collision, they were within one eighth of a mile, and they run down and hailed both vessels immediately afterwards, offering assistance; that they run round the Sarah Buck and saw no lights upon her. The testimony of these men from the Favorite is presented in such a manner as to impress upon the mind of the court strong doubt as to its truthfulness. The case was in hearing for a number of days, the entire crew of each vessel had been fully examined, and the testimony of Capt. Cook had been very minute and protracted; a number of other witnesses had been examined as to the course of the wind, and it was then suggested that each party might desire to take further testimony on that point, and for that purpose the hearing was postponed. Up to that time, no suggestion or intimation had been thrown out from either side, that any other vessel was at the time in the immediate vicinity, or that either had been hailed by a third party with an offer of assistance; on the contrary, the master of the Mary C., when inquired of in relation to other vessels, stated, "I saw other vessels one-fourth to one-half a mile off. Three or four to leeward, two or three to windward. Some were steering about same course I was, others were running off more. I passed a great many of the vessels which came out of Seal Harbor." From the testimony on both sides, the court formed the opinion that no vessel came near or offered any assistance. If Jenkins, the master of the Favorite, has testified truly, the court was led into a very great error by the testimony of Capt. Cook, "that he saw vessels one fourth to one half a mile off," when he was well aware that he had been hailed by the Favorite at the time the Sarah Buck was in a sinking condition. If such was the fact, when asking for further time, he should have frankly stated that another vessel was near by and had offered assistance at the time, and that he wished to procure the testimony of her officers and crew if practicable; but instead of so doing, under the pretence of proving the course of the wind, he obtains the opportunity of producing this testimony, all knowledge of which he had concealed from the court as well as the adverse party. The course he has adopted leads me to conclude, and I think it is not unjust to him under the circumstances, that this testimony from the Favorite is an afterthought, especially as Jenkins admits that Capt. Cook had informed him as to the points in dispute, and he

also had occasion to prompt him as a witness when under examination, and his testimony in some respects does not agree with Capt. Cook's statements, especially in regard to the course of the two vessels, which he gives west by south, and the wind which he states northwest by north, one point more westerly than Capt. Cook, and also the time of the collision, which he says was before twelve o'clock by his time, which was St. Johns, some fifteen or twenty minutes earlier than the real time, and that his watch was not called till a short time afterwards.

The court is satisfied that the Sarah Buck had her proper lights burning. The testimony from all of her crew is positive upon this point, and they must all have committed wilful perjury in relation to it if their statement is untrue, whilst that from the other vessels is of a negative character, as to their not seeing any lights; this matter of the lights is really quite immaterial in determining the rights of the parties, as both sides admit that the night was very clear, so that the vessels could be seen by each other in season to have done whatever was incumbent to have avoided the collision.

Sixteen witnesses have been examined on the part of the libellants, and seventeen for the claimants; the most material points in controversy being as to the course of the wind, and whether the Mary C. was or not close-hauled at the time the collision took place. The court has prepared a full abstract of the testimony, and it is very certain that it is utterly impossible to reconcile the evidence on these matters; no great benefit can result from a prolonged statement of the testimony of each witness, and the court therefore will confine its remarks in a great extent to the conclusions at which it has arrived in relation to them.

The answer states that when the Mary C. left Seal Harbor, the wind was varying from northwest to north-northwest. In his testimony, the master says, after getting by White Head, he headed west-southwest and sometimes southwest by west, and on that course passed north of Monhegan close-hauled to the wind; that as the wind changed to the north, he still held close up to the wind until his course was west. He has called various masters of vessels who left Seal Harbor the same night bound to the westward at about the same hour with the Mary C.; most of them represent the wind to have been northwest at Seal Harbor. Woodward, master of the Telegraph says it was baffling from northwest to northwest by west. Foster, master of the Laura represents it as west-northwest to northwest by west; none of the witnesses give the wind as far to the north as the answer N. W. to N. N. W; on the contrary they represent it as being from one to three points further west than the answer; but they all concur in their statements that when sailing westerly they were all running close-hauled to the wind. The libellants have produced

two witnesses, one of whom came out of Seal Harbor and the other from Lobster Cove near by the same evening with the Mary C. Tate who sailed from Seal Harbor says the wind was north-northwest at eight o'clock, and that he passed the Mary C. half way over to Mosquito Island standing the same course with him; that the wind was then northwest by west and he was sailing two points free. He further states that from 10½ to 12, the wind was north by east to north-northeast, which is from one to two points further east than is claimed by the libellant, and which would not have permitted the Sarah Buck to run the course she was making as stated in the libel. Trenergy, from Lobster Cove, speaks of the wind as being nearly north at White Head at eleven o'clock that night.

The master of the Mary C. claims that with the wind northwest, the vessel making seven knots, he was close-hauled on a course of southwest by west and passed Mosquito Island. Six witnesses, who for many years have been acting as pilots and masters in and about Penobscot Bay, testify that thus running close-hauled, she would not have been able to have passed Mosquito Island, but would have gone ashore either on the island or inside of it; and the argument drawn from this testimony is, that notwithstanding the statements of Capt. Cook and his crew, the Mary C. must to some extent have been running free.

From the discrepancies which exist between the allegations of the respective parties in their pleadings and the witnesses they have produced, as well as from the discrepancies between the witnesses themselves, it is extremely difficult to decide what was the exact course of the wind, and whether or not the Mary C. was absolutely close-hauled. I am satisfied the wind was changing northerly after ten, though Tate says it was N. W. by W. when he passed the Mary C., sometimes very baffling; and to some extent these facts may harmonize the statement of the witnesses, as they probably took notice of the wind at different hours and when differently situated. The nearness to the coast may also have had its effect in changing the course of the wind. The answer of the Mary C. states the wind was baffling from northwest to north-northwest, and I am inclined to adopt northwest by north as being probably the mean course of the wind at White Head when blowing steadily at the time the Mary C. left the harbor. The master says his course was more, southwest to southwest by west up to time of collision, whilst Tate, who says he passed the Mary C. sailing a like course with his own, gives his course as southwest by west, which is the true course from White Head to a point seven miles southwest of Monhegan. Admitting that at this season of the year it is usual for coasting vessels to sail as close to the coast as they well can, and that Cook, being a comparative stranger to

this vicinity, would not be likely to strike seaward beyond what was customary, I adopt his statement that his course varied from west-southwest to southwest by west, and with the wind, as I find it to have been baffling about northwest by north when they left Seal Harbor, it results that the Mary C. was not absolutely close-hauled, but that as she ran down the coast, she was sailing at times one or two points free with a baffling wind, which at times might head her off her course. Capt. Cook says, that from the time of leaving White Head until after the collision, his main sheet was not slackened, but that as the wind veered toward the north, he changed his course by following up the wind, and that he was making a west course when the collision took place. Having followed the wind, so that he must have changed his course at least two points more westerly, as he made no alteration he says in the trim of his sheets, it follows that the wind must have changed two points at least to the north, and I am therefore warranted in the conclusion that the wind must have been about north by west, not being steady, but baffling about that course.

Having thus determined that the Sarah Buck was close-hauled on her port tack, and that the Mary C. with a wind baffling about north by west was on her starboard tack, running west and within one to two points of being absolutely close-hauled, what was the duty of each vessel in a clear night, with a full breeze, each vessel having been discovered by the other in season to avoid a collision, but each having a poor lookout, as in such a night, each should have been seen from the other before they had approached within a half mile?

The claimants insist that it appears from the allegations in the libel, that these vessels were approaching end on or nearly end on, so as to involve risk of collision, as the Sarah Buck is thus stated to have been heading northeast by east, and the Mary C. southwest by west, which would make them within one point of being direct end on, and so bring them within article eleven of the regulations adopted by congress, which requires both vessels to port when approaching end on, or nearly so, so as to involve risk of collision, and which the Sarah Buck neglected to do, but starboarded her helm just before the collision took place. The answer, instead of admitting that the libel states correctly the true course of the two vessels, and submitting for the decision of the court the question, whether two vessels when approaching on opposite courses within one point are brought within the eleventh article, joins issue on the fact, and charges that the course of the Mary C. was west, making a difference of three points, and from the evidence, I believe this statement to be substantially correct; as the case stands therefore, the two vessels in fact were crossing instead of approaching end on, and the case is brought within the twelfth article, which provides that "when two sailing ships are crossing, so as to involve risk of collision, then if they have the wind on different sides the ship with the wind on the port side shall keep out of the way of the ship with the wind on the starboard side, except in the case in which the ship with the wind on her port side is close-hauled and the other ship free, in which case the latter ship shall keep out of the way."

The Sarah Buck had the wind on her port side, and was close-hauled and should have kept out of the way of the Mary C. unless she had the wind free. I find that she was nearly close-hauled with the wind at best but one or two points free and baffling, and I do not hold that she was therefore deprived of the right of way and compelled to give way to a vessel on the port tack, close-hauled. It was therefore the duty of the Sarah Buck, under the twelfth article to have kept out of the way of the Mary C., and her prudent course would have been to have ported her helm instead of starboarding. By pursuing the course which she did, she placed herself in such a position as to greatly increase, instead of diminish the risk, and she must be answerable for the consequences. If the master intended to luff, he should have done it much sooner, and not have delayed it until the vessels were in such close proximity. I therefore hold that the Sarah Buck violated the twelfth article, and that her management contributed to the injury.

I am also of the opinion that the conduct of those in charge of the Mary C. was inexcusable, and that she is not exonerated from liability. She had but one man, her master, on the lookout. He states that until the vessels came within an eighth of a mile of each other, he could not discover whether or not the Sarah Buck was approaching towards him. I am satisfied that she had her proper lights, and of course, with proper attention her course could have been determined; but without lights, the Sarah Buck was in plain sight that night, and a diligent lookout under such circumstances should have discovered her course before she approached within that distance; after she was discovered, her course should have been constantly noticed by the lookout, so as to find out what means she intended to adopt, and so that the Mary C. might be in readiness to do all that the law required of her, if she should be in danger; for although by the 12th article she had the right of way, yet that must be taken in connection with article 18, which requires that "where, by the above rules, one of two ships is to keep out of the way, the other shall keep her course subject to the qualifications contained" in article 19, viz.: "In obeying and construing these rules, due regard must be had to all dangers of navigation, and to any special circumstances which may exist in any particular case, rendering a de-

parture from the above rules necessary in order to avoid immediate danger." By article 20, it is declared that "nothing in these rules shall exonerate any ship * * from the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." Similar regulations on this subject have been adopted in England. It is declared by the privy council, in The Agra and Elizabeth Jenkins, L. R. 1 P. C. 501, "that if a ship bound to keep her course under the 18th sailing rule, justifies her departure from that rule under the 19th rule, she takes upon herself the obligation of showing not only that her departure was at the time it took place necessary in order to avoid immediate danger, but also that the course adopted by her was reasonably calculated to avoid that danger;" and the opinion says: "Their lordships therefore have come to the conclusion, that both vessels were to blame, and that the collision is attributable to both, the Agra for not sooner observing and getting out of the way of the Elizabeth Jenkins, and the Elizabeth Jenkins for departing from her course without sufficient necessity, and for departing from it in a manner calculated to increase and not to diminish or avoid danger."

In the case of The Havre [Case No. 6,232], Judge Shipman says: "I now come to another point in the case. It is a rule of prudence and sound sense, often reiterated in judicial opinions, that every vessel is bound to avoid a collision if she can; the fault of one approaching vessel does not authorize the other to run her down because she happens even through her own folly to lie in her wake. I am well aware that where the law charges one vessel with the duty of keeping out of the way of another, the corresponding duty of the other, to keep her course, is to be rigorously enforced. But it is to be enforced with intelligence and in the interest of safety, and not to be enforced, or even permitted blindly to destructive ends. It is therefore proper, in view of the fact that the Havre clearly saw the Scotland for fifteen minutes before the collision, watched her approach with more or less care for two miles, and without the slightest change in her course, struck the latter only a few feet forward of her stern, to enquire whether she did her whole duty; in other words, whether the slight change in her wheel to starboard, in order to have enabled her to clear the Scotland, might not and ought not to have been made;" and later on says: "There was risk of collision apparent for several minutes before it took place; the responsibility of avoiding it rested chiefly on the Scotland. She was bound to keep out of the way, and the Havre was bound to keep her course until it was apparent that the collision could not be avoided without a change on her part; I hold her responsible on the sole ground, that after it was clear that the only way of escape was for her to starboard her wheel she

failed to do it, and that if she had done it no accident would have occurred."

The case of The Maria Martin, 12 Wall. [79 U. S.] 47, fully sustains this principle.

When the Sarah Buck began to luff, it was the duty of the Mary C. to have held her course or take such steps, if a collision was imminent, as would be calculated to diminish, rather than to increase the danger; but instead of doing anything of that kind, the Mary C. also luffed, necessarily bringing the two vessels into collision; and to accomplish this, she swung round so much that her port side struck the Sarah Buck aft of the fore rigging. It is apparent from the position of the vessels on claimant's diagram, that when the Mary C. commenced to luff, the Sarah Buck had ranged ahead of her, so that a lookout forward could have perceived her well on the starboard bow, instead of right ahead, thereby indicating that if the Mary C. held her course, there would be no danger; and it was the duty of the lookout on the Mary C. to have carefully noticed the position of the two vessels before giving any order to luff, which was wholly inexcusable, if the vessels were then bearing from each other as laid down on the diagram. A careful examination of all the testimony and this diagram convinces me that the statement of Capt. Cook, that if he had held his course he would have struck the Sarah Buck with his starboard bow a little further aft, and if he had starboarded she would have paid off some, but would still have struck her, is not correct. On the contrary I think the statement of the master of the Sarah Buck is true, that if each vessel had held her course, they would have gone clear. The luffing of the Sarah Buck did not increase the danger to the Mary C. if she had held her course, while if she had starboarded her helm in the slightest degree after the Sarah Buck had luffed, a collision would have been impossible.

In his direct examination Capt. Cook testified that he heard some one on the Sarah Buck cry out to luff, and that this was addressed to his vessel; on his cross examination he stated, he heard the cry of luff from the Sarah Buck, but was uncertain whether it was before or after she luffed, and did not know whether it was or not addressed to his vessel. Some of the crew of the Mary C. would have the court understand that she was ordered to luff by those on board the Sarah Buck, and from this it is claimed that the Mary C. luffed in compliance with such orders; but the answer does not attempt to cast the responsibility of her luffing upon the Sarah Buck, on the contrary, it states that "the Mary C. held her course until the Sarah Buck approached nearer, when the helm of the Mary C. was put to port in order that she might lay close to the wind, and finding that the course of the Sarah Buck rendered a collision possible, the helm of the Mary C. was put hard to port," to which has been

added, "to lessen the force of the blow, collision being imminent;" and in his testimony Cook says: "I gave orders to put helm hard down, thinking she would come up more side to, and break off the blow." The Mary C. therefore is accountable for having luffed and for the consequences of deviating from her course. If she had held her course, I find the collision would not, in fact, have occurred; and she could have avoided it likewise by changing her course in an opposite direction, instead of producing it by the course she pursued. I am therefore obliged to hold her accountable jointly with the Sarah Buck; and the result is, that the damages of the two vessels must be apportioned between them.

The court can place but very little dependence on the statements of witnesses as to time or distances. Capt. Cook for instance testifies he saw the Sarah Buck one fourth to one half a mile off, and afterwards called the watch four or five minutes before the collision. It is not disputed that the vessels were approaching each other at the rate of twelve or thirteen miles per hour, less than five minutes for a mile, and at this rate, if the watch was called four or five minutes before the accident, the vessels must have been more than a mile apart when the Sarah Buck was first seen from the Mary C.

The claimant relies on the opinion of the court in The Nichols, 7 Wall. [74 U. S.] 656, where it was decided that "mistakes committed in moments of impending peril by a vessel, in order to avoid a catastrophe made imminent by the mismanagement of those in charge of another vessel, do not give the latter, if sunk and lost, a claim on the former for any damages." I do not consider this principle as applicable to the present case, because I have no doubt, that if the Mary C. had held her course, there would have been no collision; and secondly because ordinary seamanship would have satisfied a lookout attending to his duty, that the Sarah Buck when she began to luff had then ranged so far to the eastward of the Mary C., that there could be no collision if she held her course; and lastly, at the distance the vessels then were, a competent skillful master with nothing to distract his attention, the peril not being then imminent, and there being no occasion for excitement, would never have given an order to luff, which must inevitably occasion the collision. Upon the imminency of the peril at the moment, it may be well to refer to the statement in the answer, which says "that the Mary C. held her course until the Sarah Buck approached nearer, when the helm of the Mary C. was put to port in order that she might lay close to the wind, and finding that the course pursued by the Sarah Buck rendered a collision possible, the helm of the Mary C. was put hard to port." Since the answer was completed, there has been added in pencil (which additions the court does not sanction) the words "to lessen the force of the blow, collision being imminent." The imminence of the peril does not appear to have occurred either to the claimant or proctor in the early stage of the defense, as the answer itself only states that he put his helm to port when he saw the Sarah Buck approaching, thus in the very outset altering his course by laying closer to the wind, and after that, finding that the course of the Sarah Buck rendered a collision possible, not imminent or impending, he put his helm hard to port. Such a case, in my view, is not brought within the doctrine laid down by Judge Clifford in The Nichols [supra], for the answer admits that as the Sarah Buck came nearer he put his helm to port, that he might lay closer to the wind, thus changing his course without any justifiable cause, as there was then no danger, and after that, when there was only a possibility of collision, he turned towards the track on which the Sarah Buck was sailing, instead of holding his course or running away from her, and thereby produced the very result which would otherwise not have happened. It rather appears to the court that the Mary C. acted upon the theory, that under all circumstances she was bound to go to windward and compel the Sarah Buck to pass to leeward, even if a collision was occasioned thereby. Her answer shows, either inattention and want of seamanship, or a determination to go to windward, whatever might be the consequences.

The damages sustained by the loss of the Sarah Buck are testified to amount to $2,300, which includes $200 secured for freight of a cargo of hay to Salem, and which amount was lost by the master from his person, he having taken it from his cabin in an account book in which it had been put, and placed the book with the money in it under his coat for protection at the time he was getting into his boat to go on board the Mary C., when the Sarah Buck was sinking. In the confusion, the book and money were lost. This amount I find to have been lost, and I consider it a proper item of damage, and I do not find the master to have been so negligent as to relieve the Mary C. from accountability for its loss. Two sails used for covering the deck-load of hay were also lost, which are valued at $100. The boat and some of the vessel's furniture were saved. I assess the loss sustained by the Sarah Buck at $2,200. If the parties agree upon the damages sustained by the Mary C., the court will adopt that amount, otherwise an assessor will be named by the court to determine them.

Damages to be apportioned.